UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JUSTIN PARKER,

        Plaintiff,

v.                                Case No.  8:19-cv-2643-SCB-SPF

CHARTER COMMUNICATIONS,
LLC,

        Defendant.
_____/

## ORDER

This cause comes before the Court on Defendant's Motion for Summary

Judgment.  (Doc. No. 46).  Plaintiff opposes the motion (Doc. No. 52), and

Defendant has filed a reply brief (Doc. No. 57).  As explained below, the motion is

granted.

## I.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the

evidence in the light most favorable to the non-movant and resolve all reasonable

doubts in that party's favor.  See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir.

2006)(citation omitted).  The moving party bears the initial burden of showing the

Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

## II. Background

Plaintiff Justin Parker filed this lawsuit against Defendant Charter Communications, LLC ("Charter") for disability discrimination that he suffered while working for Brighthouse Networks, LLC ("BHN"). After Plaintiff's employment with BHN was terminated in early 2016, Charter and BHN combined, and Charter assumed control of BHN's operations.

Prior to starting work for BHN, Plaintiff was in the United States Marine Corps for four-and-a-half years. For approximately one year, he was deployed in Fallujah, Iraq in a war zone. (Doc. No. 48, depo. p. 306-07). After he left the Marine Corps, he was diagnosed with panic attacks, anxiety, war stress, migraine headaches, depression, adjustment disorder, post-traumatic stress disorder ("PTSD"), and paranoia. (Doc. No. 53-1, p. 87, 91, 101, 118, 131, 151, 161, 166).

Plaintiff began working for BHN in 2009, and in 2013, he advanced to the position of Customer Account Executive ("CAE") in a newly formed sales

2

department.  Initially, Plaintiff reported to Director Linda Collins.  From 2014 through April of 2015, Plaintiff reported to Manager Tom Oberecker.  From April 2015 through February 2016, Plaintiff reported to Supervisor Lyla DiDomenico.

## A.  Monthly Recurring Revenue Goals

As a CAE, Plaintiff was required to meet monthly recurring revenue ("MRR") goals.  (Doc. No. 46-3, ¶ 8; Doc. No. 48, depo. p. 62).  To do this, CAEs reached out to existing customers in an attempt to sell them additional BHN services.  (Doc. No. 46-3, ¶ 8; Doc. No. 48, depo. p. 58-59, 70).  Robin Collins, the Director of Human Resources, described the MRR goals as follows:

> MRR goals were department-based, team-based, and individual-based.  In other words, the entire CAE department had an MRR goal it was expected to meet, each CAE team had an MRR goal it was expected to meet, and each CAE had his or her own MRR goal he or she was expected to meet. MRR goals were not developed locally but were instead determined at the highest levels of BHN's sales operations and disseminated down to the local level, including the CAE department in which Plaintiff worked. The CAE department therefore did not have the ability to reduce those goals.
>
> Accordingly, though a CAE out on an approved leave of absence (whether FMLA or non-FMLA) was not held accountable for his or her personal MRR goals, the department and team goals could not and were not adjusted to account for that CAE's absence. Instead, it fell to other members of the absent CAE's team to cover his or her sales goals.

(Doc. No. 46-3, ¶ 9-10; *see also* Doc. No. 48, depo. p. 112-13).

Plaintiff, as a CAE, was supposed to achieve 90% of his MRR goal. While Plaintiff sometimes exceeded his MRR goal for the month, he often failed to achieve 90% of his MRR goal.[1]  (Doc. No. 53-3, p. 51, 68-69, 75; Doc. No. 55-1, p. 66; Doc. No. 55-3, depo. p. 42; Doc. No. 55-2, p. 77; Doc. No. 48, depo. p. 291-92).

## B.  Accommodations for Dyslexia

In 2012, prior to becoming a CAE, Plaintiff applied for a position within BHN that he did not get, and when he asked why, a manger told him that he would not get promoted within the company until he worked on his written communication skills.  (Doc. No. 48, depo. p. 18-19).  Plaintiff contends that his written communication is hindered by his dyslexia, and he asked BHN to provide him with a tutor to help him.  (Doc. No. 48, depo. p. 19).  Plaintiff told BHN that he had been diagnosed with dyslexia while in school, and to support his diagnosis, he provided BHN with his high school transcript that showed that he was in special education classes.  (Doc. No. 48, depo. p. 22, 53).  Plaintiff's high school transcript does not state that he had dyslexia.  (Doc. No. 48, depo. p. 53).  BHN agreed to provide him with, and to pay for, a tutor.  (Doc. No. 48, depo. p. 19).

---

[1] Plaintiff points out in his response brief that he achieved 290% of his MRR goal in November of 2015.  (Doc. No. 55-1, p. 66).  However, the document showing that Plaintiff achieved 290% of his $2,100 MRR goal in November 2015 also shows that he failed to achieve 90% of his MRR goal in February, March, April, May (adjusted MRR), July, and August of 2015.  (Doc. No. 55-1, p. 66; Doc. No. 48-5; Doc. No. 48, depo. p. 127-33; Doc. No. 46-3, p. 18, § 2.5).

Around April of 2015, Plaintiff asked Human Resources if they would pay for a different program to help him with his dyslexia. (Doc. No. 48, depo. p. 23-25). By this time, the person who had approved the tutor accommodation was no longer in HR, and HR told Plaintiff that he would have to get tested and provide medical documentation of his dyslexia before BHN would consider providing the new program as an accommodation for his dyslexia. (Doc. No. 48, depo. p. 21-23). The testing would cost about $1,000, and Plaintiff told HR that he could not afford the testing and asked if BHN would pay for it. (Doc. No. 48, depo. p. 21-22). BHN would not pay for Plaintiff's dyslexia testing and did not further consider providing Plaintiff with the new program to accommodate his dyslexia. (Doc. No. 48, depo. p. 22). By June of 2015, Plaintiff knew that BHN would not pay for his dyslexia testing nor would it consider providing the new program as an accommodation without Plaintiff getting tested and diagnosed with dyslexia. (Doc. No. 48, depo. p. 90-91).

At the time of his request for the new program accommodation, Plaintiff had not used the services of the tutor that BHN had provided for approximately ten months. (Doc. No. 48, depo. p. 26, 52). Plaintiff contends that after he asked BHN to pay for the new program accommodation, BHN refused to allow him to continue with the tutoring until he was tested and diagnosed with dyslexia. (Doc. No. 48, depo. p. 56). However, Plaintiff acknowledged during his deposition that

had he provided BHN with medical documentation of his dyslexia, BHN would have considered providing him with the new program as an accommodation. (Doc. No. 48, depo. p. 53-54).

### C. Alleged Discriminatory Treatment Due to Plaintiff's Dyslexia

Plaintiff contends that coworkers and his manager, Oberecker, made fun of him because he was dyslexic. As an example, Plaintiff states that Oberecker put a grammar book on Plaintiff's desk and laughed while stating that the book would help Plaintiff. (Doc. No. 48, depo. p. 79). However, Plaintiff concedes that Oberecker (as well as Director Linda Collins and supervisor DiDomenico) legitimately believed that Plaintiff needed to improve his written communication skills. (Doc. No. 48, depo. p. 80-81).

Another example is that on August 18, 2014, Plaintiff's coworker, Ian Ochoa, sent an email to Plaintiff with the subject line stating: "The parker file." (Doc. No. 48, depo. p. 105-06; Doc. No. 48-4). Attached to the email was a file that contained copies of Plaintiff's notes in which he made spelling and other writing errors. (Doc. No. 48, depo. p. 108; Doc. No. 48-4). Plaintiff contends that Ochoa kept the emailed file on a shared drive and that Plaintiff's other coworkers also contributed to the file. (Doc. No. 48, depo. p. 108). Plaintiff contends that Ochoa sent the email to Plaintiff to make fun of his dyslexia. (Doc. No. 48, depo. p. 107).

**D.  Plaintiff's Leave Due to His Disabilities**

After Plaintiff left the Marine Corps, he was diagnosed with panic attacks, anxiety, war stress, migraine headaches, depression, adjustment disorder, PTSD, and paranoia.  (Doc. No. 53-1, p. 87, 91, 101, 118, 131, 151, 161, 166).  These disabilities caused Plaintiff to request FMLA leave, both intermittent leave and block leave, during the course of his employment with BHN.

For example, Plaintiff took 28 days of intermittent FMLA leave in 2014 and a block of leave due to his anxiety from October 27, 2014 through January 2, 2015. (Doc. No. 48, depo. p. 150-51: Doc. No. 53-1, p. 139-43; Doc. No. 53-3, p. 88-90; Doc. No. 53-5, p. 169-75).  The block leave consisted of FMLA leave through December 9, 2014 (when his accumulated FMLA leave was exhausted) and an accommodation of non-FMLA medical leave from December 10, 2014 through January 2, 2015.  (Doc. No. 46-3, ¶ 13).

In 2015, Plaintiff took 13 days of intermittent FMLA leave from April through August.  (Doc No. 53-5, p. 177-80).  Thereafter, Plaintiff missed approximately 48 of his 85 scheduled workdays from September 2015 through December of 2015.[2]  (Doc. No. 46-3, ¶ 12-13; Doc. No. 53-5, p. 180-82; Doc. No. 53-1, p. 239-42).

---

[2] Of the 48 workdays missed, 24 hours (or three days) were classified as vacation days.  (Doc. No. 53-1, p. 240-42).

**E. Alleged Discriminatory Treatment Due to Plaintiff Taking Leave**

Plaintiff contends that Director Linda Collins and his manager, Oberecker, treated him in a discriminatory manner because he had taken leave due to his disabilities. For example, after Plaintiff would return from taking leave, Oberecker and Linda Collins would ignore him or talk down to him in a manner that showed that they were not happy that he had taken leave. (Doc. No. 48, depo. p. 103; Doc. No. 53-1, depo. p. 132-39). Plaintiff spoke to HR about this in March and April of 2015. (Doc. No. 53-1, depo. p. 136-39).

Plaintiff also contends that his coworkers made fun of him for being out on FMLA leave, stating things like "you finally decided to come back in" when he returned from leave. (Doc. No. 48, depo. p. 101-02). Plaintiff, however, acknowledges that no one said anything about his disabilities; people just commented or treated him differently because he was out on leave. (Doc. No. 48, depo. p. 102-03).

Another example is that after Plaintiff returned from his block leave in January of 2015, Oberecker gave Plaintiff a verbal warning for not hitting his MRR goals prior to his leave. (Doc. No. 48, depo. p. 82-83). Plaintiff complained about the discipline to HR, because he believed that Oberecker had not adjusted his MRR goals to reflect the intermittent FMLA leave that he had taken. (Doc. No.

48, depo. p. 83-85).  Robin Collins in HR agreed with Plaintiff and removed the discipline.  (Doc. No. 48, depo. p. 84-85).

### F.  Plaintiff's Termination

Plaintiff missed approximately 48 of his 85 scheduled workdays from September 2015 through December 31, 2015.  (Doc. No. 46-3, ¶ 12-13; Doc. No. 53-1, p. 239-42; Doc. No. 53-5, p. 180-82).  On December 22, 2015, Plaintiff began a block of FMLA leave.  (Doc. No. 46-3, ¶ 14; Doc. No. 53-3, p. 110).  On January 5, 2016, Plaintiff obtained a note from Dr. Harris, Plaintiff's psychiatrist, that stated that Plaintiff could return to work on January 6, 2016 without restrictions.  (Doc. No. 46-3, ¶ 14; Doc. No. 46-3, p. 30).  On January 6, 2016, Plaintiff requested an extension of his leave, and his FMLA leave was exhausted on January 8, 2016.  (Doc. No. 46-3, ¶ 15; Doc. No. 53-5, p. 122).

On January 9, 2016, Plaintiff met with Dr. Russell, a psychotherapist that Plaintiff had not seen for over eleven months.  (Doc. No. 53-1, p. 160; Doc. No. 48, depo. p. 223, 239-40).  Dr. Russell filled out accommodation paperwork to support Plaintiff's request for non-FMLA medical leave through March 21, 2016 as an accommodation for his PTSD and anxiety.  (Doc. No. 53-1, p. 159-69; Doc. No. 48, depo. p. 152; Doc. No. 48-22).  In the paperwork, Dr. Russell stated that Plaintiff was "stress & anxious – cannot make phone calls – unable to concentrate at work."  (Doc. No. 53-1, p. 167).

BHN considered his request for an accommodation and partially granted it—providing Plaintiff with non-FMLA medical leave through February 7, 2016 as an accommodation. (Doc. No. 53-3, p. 106; Doc. No. 46-3, ¶ 20; Doc. No. 48, depo. p. 249; Doc. No. 53-5, p. 135). Plaintiff was told that if he did not return to work on February 8, 2016, BHN would not continue to hold his CAE position for him and would release his position to be filled by someone else. (Doc. No. 48, depo. p. 253; Doc. No. 48-24).

Plaintiff did not return to work on February 8, 2016, and as a result, BHN released Plaintiff's CAE position. (Doc. No. 46-3, ¶ 21; Doc. No. 53-3, p. 101; Doc. No. 53-1, depo. p. 84; Doc. No. 48, depo. p. 253). BHN determined that it could only accommodate Plaintiff through February 7, 2016, because Plaintiff's absence made his team's and his department's MRR goals difficult, if not impossible, to achieve. (Doc. No. 46-3, ¶ 17).

In coming to this conclusion, Robin Collins from HR spoke with Linda Collins, Oberecker, and DiDomenico to determine the business needs of the CAE department and how Plaintiff's absences affected its operations.[3] (Doc. No. 53-1,

---

[3] Plaintiff argues that BHN's reasons for denying the requested accommodation have shifted during this litigation, but his citation to the record does not support his assertion. (Doc. No. 52, p. 7-8). For example, Plaintiff contends that Oberecker and Linda Collins deny that they spoke with Robin Collins, but the deposition pages that he cites in support do not specifically support his contention. Also, those depositions occurred in November of 2020—more than four-and-a-half years after they would have had the discussions with Robin Collins.

Additionally, Plaintiff contends that BHN's leave administrator, Samantha Killilea in HR, gave shifting reasons for the BHN's denial of additional accommodated medical leave.

depo. p. 106-16; Doc. No. 53-5, depo. p. 123). Based on these discussions, Robin

Collins learned the following: The CAE department was a smaller department, so

Plaintiff's absence impacted the distribution of the department's workload. (Doc.

No. 53-1, depo. p. 78). The other CAEs on Plaintiff's team complained that

Plaintiff's absences created a hardship on them and that they were being

overworked because they had to absorb Plaintiff's responsibilities and make up for

his MRR goals. (Doc. No. 46-3, ¶ 18; Doc. No. 53-1, depo. p. 195; Doc. No. 55-2,

depo. p. 33, 53). Additionally, supervisor DiDomenico was required to spend a

significant amount of time servicing Plaintiff's accounts and making up for his

missed MRR goals, which made her largely unavailable to assist and coach other

CAEs. (Doc. No. 46-3, ¶ 18; Doc. No. 53-1, depo. p. 195; Doc. No. 55-2, depo. p.

33, 51-55).

As a result, BHN decided that any further absence by Plaintiff beyond

February 7, 2016 was not sustainable and would create an undue hardship on the

---

When citing to her deposition testimony, Plaintiff fails to put the testimony in context by citing to three pages earlier (pages 83-85) wherein she explained that she did not remember the specifics surrounding Plaintiff's accommodation request that was made more than four-and-a-half years prior. (Doc. No. 53-5, depo. p. 83-85, 122).

The initial reason Killilea gave in her deposition for BHN only partially granting the requested accommodation was based on the reason stated on the paperwork filled out by Plaintiff's doctor—that Plaintiff was unable to make phone calls (although Killilea incorrectly stated that he was unable to *answer* phone calls). (Doc. No. 53-1, p. 167; Doc. No. 53-5, depo. p. 88). Later in her deposition, Killilea clarified that the reason BHN only partially granted Plaintiff's accommodation request was due to the CAE department's workload and the need to replace headcount. (Doc. No. 53-5, depo. p. 122-23). This clarification was consistent with her prior answer, as making phone calls to customers in order to upsell BHN's products was part of the workload of the CAE department.

CAE department's business operations.[4]  (Doc. No. 43-3, ¶ 19; Doc. No. 53-1, depo. p. 113, 199-200; Doc. No. 55-2, depo. p. 55-57, 95, 98-100, 144-146).  BHN would have preferred that Plaintiff returned to his CAE job rather than BHN having to hire and train a new employee to fill Plaintiff's position, which is why BHN offered Plaintiff one month of accommodated medical leave.  (Doc. No. 53-1, depo. p. 78-79).  Plaintiff acknowledged in his deposition that he has no evidence that BHN released his position due to his disabilities.  (Doc. No. 48, depo. p. 264).

After BHN released Plaintiff's CAE position, BHN told him that he could apply for any open positions within BHN for which he was qualified and kept him on payroll until his short-term disability benefits expired.  (Doc. No. 48, depo. p. 259; Doc. No. 46-3, ¶ 23).  Plaintiff's CAE position was filled in February 2016 by Michael Xeroseres.  (Doc. No. 53-1, depo. p. 203-04).

On March 6, 2016, Plaintiff applied for a position in the CAE department that reported to a different supervisor.  (Doc. No. 46-3, ¶ 22; Doc. No. 53-6, p. 1; Doc. No. 53-1, depo. p. 92-93).  However, that position was filled by David

---

[4] During her deposition, DiDomenico pointed out that her department was short-staffed and trying to make its performance goals, which impacted not only BHN, because the company had sales goals that it needed to meet, but it also affected the customer experience. (Doc. No. 55-2, depo. p. 98-99).  DiDomenico stated that BHN's reputation in the industry was critical, so she was concerned about the workload and making sure that she had the staff necessary to meet the department's goals.  (Doc. No. 55-2, depo. p. 99).  DiDomenico also noted that during the relevant time period, BHN was anticipating a merger with Charter, so there was additional pressure to deliver solid performance results.  (Doc. No. 55-2, depo. p. 144-46).

Martinjak on March 3, 2016, before Plaintiff applied for it. (Doc. No. 53-1, depo. p. 94, 97-98).

Plaintiff applied for two other positions within BHN that were outside of the CAE department. Specifically, on March 12, 2016, Plaintiff applied for a Business Account Executive position, and on March 18, 2016, he applied for an Advanced Products Account Executive position. (Doc. No. 53-6, p. 15, 25-26). Plaintiff was offered interviews for both positions, but BHN did not select Plaintiff for either position. (Doc. No. 53-6, p. 29-30; Doc. No. 46-3, ¶ 22). BHN contends that Plaintiff was not the most qualified candidate for the positions, and BHN points out that none of Plaintiff's former management (*i.e.,* Linda Collins, Oberecker, and DiDomenico) were involved in the hiring decisions for the positions. (Doc. No. 46-3, ¶ 22). Further, the decision-makers for those positions were not made aware of Plaintiff's disabilities, FMLA leave, non-FMLA leave, or the accommodations that BHN had made for him. (Doc. No. 46-3, ¶ 22).

During his deposition, Plaintiff stated that he believes that BHN retaliated against him for taking FMLA leave by not hiring him for either of the two positions. (Doc. No. 48, depo. p. 290). However, Plaintiff concedes in his deposition that he does not have any evidence to support his retaliation assertion, nor does he know the qualifications of the people selected for the two positions or whether they were more qualified than him. (Doc. No. 48, depo. p. 263-64, 290-

13

91).  Plaintiff also concedes in his deposition that he has no evidence that the reason he was not selected for the two positions was due to his disabilities.  (Doc. No. 48, depo. p. 264).

On March 15, 2016, Dr. Russell informed BHN that Plaintiff could return to work on March 21, 2016 without restrictions.  (Doc. No. 53-5, p. 194).  However, after his short-term disability benefits expired on March 28, 2016, BHN administratively terminated Plaintiff's employment, because Plaintiff had not obtained another position within BHN.  (Doc. No. 46-3, ¶ 23).  Thereafter, on July 23, 2019, Plaintiff filed suit in state court, which Defendant removed to this Court. Plaintiff asserts three claims under the Florida Civil Rights Act ("FCRA") in his amended complaint: (1) disability discrimination – adverse employment action, (2) failure to accommodate, and (3) retaliation.[5]  (Doc. No. 16).

## III.  Motion for Summary Judgment

Defendant filed the instant motion for summary judgment on all three of Plaintiff's claims, arguing that Plaintiff failed to first exhaust his administrative remedies and that the evidence does not support his claims.  As explained below, the Court finds that Defendant is entitled to summary judgment on all of Plaintiff's claims.

---

[5] There are two types of disability discrimination claims—ones involving an adverse employment action and ones involving a failure to accommodate.  See Callais v. United Rentals North America, Inc., 2019 WL 2169182, at *4 (M.D. La. May 17, 2019).

## A.  Exhaustion of Administrative Remedies

Defendant argues that Plaintiff's claims fail, because he did not exhaust his administrative remedies.  As explained by one court:

> Prior to filing a civil action alleging discrimination in violation of the FCRA, the individual seeking relief must file a complaint with the Florida Commission on Human Relations ["FCHR"] within 365 days of the alleged violation and exhaust the administrative remedies provided by the FCRA.    Under a worksharing arrangement between the [FCHR] and the U.S. Equal Employment Opportunity Commission ("EEOC"), each agency has authorized the other to accept discrimination charges or complaints on the other's behalf.  In this context, the date the complaint is filed with the [FCHR] is the earliest date of filing with the EEOC or the [FCHR]. Once this filing occurs, the [FCHR] has 180 days to investigate the allegations in the complaint and determine if reasonable cause exists to believe that a discriminatory practice has occurred.

Sheridan v. State of Fla., Dept. of Health, 182 So.3d 787, 789–90 (Fla. 1st DCA 2016) (internal citations omitted).

If the FCHR fails to conciliate or determine whether there is reasonable cause on any complaint within 180 days after the filing of the complaint, the FCHR must promptly notify the aggrieved person of this by mail.  Fla. Stat. § 760.11(8)(b).  Furthermore, the FCHR's notice shall inform the aggrieved person that he may file a civil action, and if he chooses to do so, he must file it within one year after the date the FCHR certifies that the notice was mailed. Fla. Stat. § 760.11(8)(b).

Plaintiff contends that on September 16, 2016, he mailed and faxed his charge of discrimination to the EEOC to be dual-filed with the FCHR. (Doc. No. 48-2; Doc. No. 53-7; Doc. No. 53-8). Plaintiff contends that he was assigned charge number 510-2016-05398. (Doc. No. 53-8). However, both the EEOC and the FCHR have stated that no charge of discrimination for Plaintiff could be located. (Doc. No. 46-2, p.199-206). The EEOC has stated that its electronic database "indicates that an inquiry was made in regards to filing a charge, a tracking number was assigned 510-2016-05398N, but a charge was never formalized." (Doc. No. 46-2, p. 200).

Plaintiff also submits a screenshot of his attempt to find out the status of his charge in the EEOC's database on April 20, 2017. (Doc. No. 53-7, p. 2). The screenshot shows the following: (1) a statement that the database is available to people who have open charges with the EEOC that were filed on or after September 2, 2015; (2) the entry of charge number 510-2016-05398 into the database search box; and (3) the response that the database is not available for the charge number entered "since it was filed before the system became operational." (Doc. No. 53-7, p. 2). Plaintiff does not contend that he filed his charge before the database became operational on September 2, 2015, and as such, this screenshot supports Defendant's contention that the EEOC (and thus the FCHR) did not receive his charge of discrimination.

Based on the above, the evidence construed in the light most favorable to Plaintiff shows that he mailed and faxed the charge of discrimination to the EEOC to be dual-filed with the FCHR, but neither entity can locate the charge. Thus, a genuine issue of material fact exists regarding whether Plaintiff filed, and the EEOC and FCHR received, Plaintiff's charge of discrimination. However, as explained in the remainder of this order, Defendant is entitled to summary judgment on the merits of Plaintiff's claims.

Furthermore, even assuming that Plaintiff dual-filed his charge of discrimination on September 16, 2016, any of his claims that arose prior to September 16, 2015 would be time-barred. Defendant argues that Plaintiff's claims relating to accommodations for his dyslexia are time-barred, because by June of 2015, Plaintiff knew that BHN would not pay for his dyslexia testing. (Doc. No. 48, depo. p. 90-91). Further, by June of 2015, Plaintiff knew that BHN would not provide any further accommodation for his dyslexia without medical testing substantiating his alleged dyslexia diagnosis. The Court agrees with Defendant that Plaintiff's claims regarding BHN's failure to accommodate Plaintiff's dyslexia are time-barred, and Defendant is entitled to summary judgment on such claims.

## B. Disability Discrimination – Adverse Employment Action

In Count I, Plaintiff asserts a disability discrimination claim based on his dyslexia, PTSD, anxiety, and depression. In evaluating Plaintiff's disability discrimination claim, the Court is mindful of the following:

> Disability discrimination claims under the FCRA are analyzed under the same framework as claims brought under the Americans with Disabilities Act ("ADA"). The ADA mandates that employers shall not discriminate against a qualified individual on the basis of disability in regard to, among other things, the discharge of employees and other terms, conditions, and privileges of employment. To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability.
>
> To show unlawful discrimination, a plaintiff must demonstrate that he suffered an adverse employment action. [In determining whether the plaintiff suffered an adverse employment action, courts] employ an objective test: the plaintiff must demonstrate that a reasonable person in his position would view the challenged action as adverse. [Courts] have held that an adverse employment action must be something causing a "*serious and material* change in the terms, conditions, or privileges of employment."

Kirkland v. City of Tallahassee, 2021 WL 1234755, at *3 (11th Cir. Apr. 1, 2021) (internal citations omitted).

Plaintiff identifies six adverse actions to support his disability discrimination claim. Plaintiff contends that BHN discriminated against him by: (1) subjecting

him to ridicule from his coworkers and supervisors, (2) issuing unwarranted disciplinary action, (3) denying him educational opportunities, (4) forcing him to take a medical leave of absence,[6] (5) refusing to reinstate him to his CAE position when he came back from his short-term disability leave in March of 2016, and (6) terminating his employment. (Doc. No. 16, ¶ 68). The Court construes Plaintiff's claim—that Defendant denied him educational opportunities—to be referring to BHN's failure to accommodate his dyslexia by refusing to continue to provide Plaintiff with a tutor and refusing to consider the new program that Plaintiff was interested in for his dyslexia. However, the Court has already found that such accommodation claims are time-barred. Accordingly, the Court will evaluate the remaining bases for Plaintiff's disability discrimination claim.

### 1. Ridicule

Plaintiff contends that BHN discriminated against him by subjecting him to ridicule from his coworkers and supervisors. Plaintiff does not really focus on this contention in his opposition brief. As best as the Court can surmise, the ridicule consists of: (1) Oberecker putting a grammar book on Plaintiff's desk and laughing

---

[6] Plaintiff does not explain how BHN forced him to take a medical leave of absence. It appears that Plaintiff considers BHN's refusal to accommodate him with non-FMLA medical leave from February 8, 2016 through March 21, 2016 to be equivalent to forcing him to go on short-term disability leave. Plaintiff's contention—that BHN forced him to take a medical leave of absence—is an underlying basis for all three of his claims. As such, the Court will construe this contention as being that BHN failed to accommodate his request for additional leave, which Plaintiff believes forced him to go on short-term disability leave.

while stating that the book would help Plaintiff; (2) Plaintiff's coworker, Ian Ochoa, sending an email to Plaintiff that attached a file that his coworkers may have contributed to that contained copies of Plaintiff's notes in which he made spelling and other writing errors; (3) Oberecker and Linda Collins ignoring him or talking down to him in a manner that showed that they were not happy that he had taken leave; and (4) Plaintiff's coworkers making fun of him for being out on FMLA leave, stating things like "you finally decided to come back in" when he returned from leave. To the extent that Plaintiff contends that the alleged harassment rises to the level of an adverse employment action, the Court rejects this argument and finds that Defendant is entitled to summary judgment on the claim. See id. at *4 (finding that the teasing and harassment based on the plaintiff's disabilities did not rise to the level of an adverse employment action).

While not explicitly asserted as such, the Court construes this allegation as possibly an attempt to assert a hostile work environment claim based on disability-related ridicule from his coworkers and supervisors. In order to succeed on a claim of disability harassment, Plaintiff must show that "he: (1) is a qualified individual with a disability under the ADA; (2) was subject to unwelcome harassment; (3) the harassment was based on his . . . disability; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his . . . employment and to create an abusive working environment; and (5) that the employer knew or should have

known of the harassment and failed to take prompt and effective remedial action." Razner v. Wellington Regional Medical Center, Inc., 837 So.2d 437, 441 (Fla. 4th DCA 2002) (citing McCaw Cellular Communications of Fla., Inc. v. Kwiatek, 763 So. 2d 1063, 1066 (Fla. 4th DCA 1999)). To the extent that Plaintiff is asserting a disability harassment claim, such a claim fails, because the evidence before the Court does not show that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.

"To prove an 'abusive work environment,' the plaintiff must show that the working environment was objectively hostile or abusive, and also that the plaintiff subjectively perceived it as hostile or abusive. In determining whether such an environment is hostile or abusive, the court must consider the frequency of the discriminatory conduct; its severity; whether it was physically threatening, humiliating, or just a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance." Kwiatek, 763 So.2d at 1066 (internal citations omitted). While Plaintiff may have subjectively perceived the alleged conduct as severe and pervasive, the conduct, when viewed objectively, was not sufficiently severe or pervasive to be actionable. The discrimination laws do not create a general civility code, and not all inappropriate conduct in the workplace rises to the level of a hostile work environment. Accordingly, to the

extent that Plaintiff is asserting a disability harassment claim, Defendant is entitled to summary judgment.

## 2. Disciplinary Action

Next, Plaintiff contends that BHN discriminated against him by issuing unwarranted disciplinary action. Specifically, after Plaintiff returned from his block leave in January of 2015, Oberecker gave Plaintiff a verbal warning for not hitting his MRR goals prior to his leave. Plaintiff complained about the discipline to HR, because he believed that Oberecker had not adjusted his MRR goals to reflect the intermittent FMLA leave that he had taken. Robin Collins in HR agreed with Plaintiff and removed the discipline. (Doc. No. 48, depo. p. 84-85).

Oberecker's rescinded reprimand is not an adverse employment action that can support Plaintiff's disability discrimination claim. The Eleventh Circuit has stated that a decision to reprimand an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action. See Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001) (citations omitted). Plaintiff has not alleged any tangible harm that resulted from the rescinded reprimand, and as such, to the extent that Plaintiff's disability discrimination claim is based on the rescinded reprimand, Defendant is entitled to summary judgment.

### 3.  Short-Term Disability Leave

Next, Plaintiff contends that BHN discriminated against him by forcing him to take a short-term disability leave of absence rather than accommodating his request for additional leave.  Plaintiff has not explained how this could be characterized as an adverse employment action.  Instead, this appears to be a basis for a failure to accommodate claim.  See McGuire v. Miami-Dade County, 418 F. Supp.2d 1354, 1358, 1361 (S.D. Fla. 2006) (rejecting the contention—that the employer's failure to grant the plaintiff's request for an accommodation required her to take short-term disability—was an adverse employment action and stating that "[a]n allegation that an employer has failed to accommodate is not in and of itself an allegation of an adverse employment action").  Accordingly, the Court will analyze this contention in connection with Plaintiff's failure to accommodate claim later in this order.

### 4.  Reinstatement

Next, Plaintiff contends that BHN discriminated against him by refusing to reinstate him to his CAE position when he came back from his short-term disability leave in March of 2016.  The evidence before the Court shows that Plaintiff's position was filled in February 2016, and Plaintiff was not released back to work until March 21, 2016.  (Doc. No. 53-1, depo. p. 203-04).  Plaintiff conceded during his deposition that he had no evidence that the reason BHN did

not hold his position for him after February 7, 2016 was due to his disabilities. (Doc. No. 48, depo. p. 264). Thus, it appears that Plaintiff is arguing that BHN should have accommodated his disability by holding his CAE position for him until he could return to work. Accordingly, the Court will analyze this contention in connection with Plaintiff's failure to accommodate claim later in this order.

## 5. Terminating his Employment

Next, Plaintiff contends that BHN discriminated against him by terminating his employment when he returned from short-term disability leave. Prior to returning from short-term disability leave, Plaintiff was told that his CAE position would be released if he did not return to work on February 8, 2016 but that he could apply for any open positions within BHN for which he was qualified. Plaintiff's CAE position was filled in February 2016, prior to him being released back to work in March. As a result, Plaintiff applied for three other positions within BHN.

On March 6, 2016, Plaintiff applied for another position in the CAE department, but that position was filled already filled on March 3, 2016. Plaintiff cannot claim disability discrimination for failing to be awarded a position that had already been filled prior to him applying for the position. See Willis v. Conopco, Inc., 108 F.3d 282, 284 (11th Cir. 1997) (stating that "[r]eassignment to another

position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified").

Plaintiff also applied for two other positions within BHN that were outside the CAE department. Specifically, on March 12, 2016, Plaintiff applied for a Business Account Executive position, and on March 18, 2016, he applied for an Advanced Products Account Executive position. BHN did not select Plaintiff for either position. Because Plaintiff did not get either position, his employment with BHN was terminated when he returned from short-term disability leave.

To the extent that Plaintiff contends that he was not selected for these positions due to a discriminatory animus by BHN, the record refutes such a suggestion. Even assuming that Plaintiff could show a *prima facie* case of disability discrimination—that he is disabled, that he is a qualified individual, and that he was subjected to unlawful discrimination because of his disability— Plaintiff cannot overcome Defendant's legitimate, non-discriminatory reason for not selecting him for either of these positions.

Under the burden-shifting framework applied to Plaintiff's discrimination claim, if Defendant provides a legitimate, non-discriminatory reason for its action in response to Plaintiff's proffer of evidence supporting a *prima facie* case, then Plaintiff must offer evidence showing that Defendant's proffered reason is pretextual. See Banim v. Fla. Department of Business & Professional Regulation,

689 Fed. Appx. 633, 635 n.3 (11th Cir. 2017).  In evaluating the evidence, the

Court is mindful of the following:

> When analyzing pretext, the factfinder must determine whether the employer's proffered reasons were "a coverup for a . . . discriminatory decision."  Considering all the evidence, the court must ascertain whether the plaintiff sufficiently cast doubt on the defendant's proffered non-discriminatory reasons to allow a reasonable factfinder to find the defendant's proffered "legitimate reasons were not what actually motivated its conduct."  In doing so, the court must evaluate whether the plaintiff demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."

Id. at 635 (internal citations omitted).

Defendant proffers the following legitimate, non-discriminatory reason for

not selecting Plaintiff for either position—Plaintiff was not the most qualified

candidate for the positions.  Plaintiff concedes that he does not know the

qualifications of the people selected for the two positions or whether they were

more qualified than him.  (Doc. No. 48, depo. p. 263-64).  Plaintiff also concedes

that he has no evidence that the reason that he was not selected for the two

positions was due to his disabilities.  (Doc. No. 48, depo. p. 264).

Further, Defendant points out that none of Plaintiff's former management

(*i.e.,* Linda Collins, Oberecker, and DiDomenico) were involved in the hiring

decisions for the positions.  Defendant has also offered evidence that the decision-

makers for those positions were not made aware of Plaintiff's disabilities, FMLA leave, non-FMLA leave, or the accommodations that BHN had made for him.

Plaintiff does not specifically address Defendant's legitimate, non-discriminatory reason for not selecting him for the two open positions. Instead, he focuses on BHN's failure to accommodate him by holding his CAE position open until he was able to return to work in March of 2016. (Doc. No. 52, p. 18-19). As such, the Court concludes that Plaintiff has not shown that Defendant's proffered reason is pretextual. Therefore, to the extent that Plaintiff is claiming disability discrimination based on BHN's failure to select him for the two open positions (as well as the other CAE position that was not available when he applied for it), the Court finds that Defendant is entitled to summary judgment.

Because there was no open position for Plaintiff to fill when he returned from short-term disability leave in March of 2016, Plaintiff's employment was terminated. Plaintiff has not proffered any evidence that his termination was a result of disability discrimination. In fact, Plaintiff acknowledged during his deposition that he has no evidence that BHN released his CAE position due to his disabilities. (Doc. No. 48, depo. p. 264). Therefore, to the extent that Plaintiff contends that his termination resulted from disability discrimination, Defendant is entitled to summary judgment.

## C. Failure to Accommodate

In Count II, Plaintiff contends that BHN failed to provide him with reasonable accommodations for his disabilities when BHN did the following: (1) first approved of, and then unilaterally withdrew, his tutor accommodation for his dyslexia; (2) forced him to take a medical leave of absence; (3) refused to reinstate him to his CAE position when he came back from his short-term disability leave in March of 2016, and (4) terminated his employment. (Doc. No. 16, ¶ 76). As previously stated, the Court has already found that any accommodation claims relating to Plaintiff's dyslexia are time-barred.

The remaining three bases for Plaintiff's failure to accommodate claim can be considered together. Specifically, Plaintiff contends that BHN should have accommodated his disabilities by granting Plaintiff accommodated medical leave from January 9, 2016 through March 21, 2016 (as requested) and then held his CAE position for him until he was able to return to work.[7] Thus, the threshold issue in this case is whether BHN was required to grant Plaintiff the accommodation of an additional two-and-a-half months of medical leave.

To prevail on a failure to accommodate claim under the FCRA, Plaintiff must show that: (1) he was a qualified individual with a disability; (2) he made a

---

[7] Plaintiff's doctor, Dr. Russell, stated that Plaintiff could return to work on March 21, 2016, but Plaintiff remained on short-term disability leave until March 28, 2016. (Doc. No. 53-5, p. 194; Doc. No. 46-3, ¶ 23).

specific request for a reasonable accommodation that would allow him to perform his job's essential functions; and (3) BHN failed to provide a reasonable accommodation. See D'Onofrio v. Costco Wholesale Corporation, 964 F.3d 1014, 1021 (11th Cir. 2020); Kirkland, 2021 WL 1234755, at *3. The Court notes that "[p]rior accommodations do not make an accommodation reasonable." Ivey v. First Quality Retail Service, 490 Fed. Appx. 281, 285 (11th Cir. 2012).

Defendant argues that Plaintiff cannot show that he was a qualified individual with a disability or that he requested a reasonable accommodation that would have allowed him to perform the essential functions of his job. The Court needs not address these arguments, because even if Plaintiff can point to evidence that would support a *prima facie* case of a failure to accommodate, liability will not be imposed on Defendant if Defendant shows that the requested accommodation would have imposed an undue hardship. See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997) (citing 42 U.S.C. § 12112(b)(5)(A)). The burden is on Defendant to prove the affirmative defense of undue hardship.[8] See Conopco, 108 F.3d at 286.

---

[8] "That the evidence probative of the issue of whether an accommodation for the employee is reasonable will often be similar (or identical) to the evidence probative of the issue of whether a resulting hardship for the employer is undue, does not change the fact that establishing that a reasonable accommodation exists is a part of an ADA plaintiff's case, whereas undue hardship is an affirmative defense to be pled and proven by an ADA defendant." Conopco, Inc., 108 F.3d at 286. "[T]he question of whether an accommodation is reasonable (though it must be determined within a given set of specific facts) is more of a 'generalized' inquiry than the question of

Defendant argues that an additional two-and-a-half months of accommodated medical leave would have created an undue hardship. The remaining members of the CAE department complained that they were being overworked by having to make up for Plaintiff's MRR goals, and his supervisor was not able to supervise the department because she, too, was having to do some of Plaintiff's work. Defendant contends that consideration was given to the effect that Plaintiff's continued absence would have on BHN's operations, and BHN concluded that it could only offer an additional month of accommodated medical leave before Plaintiff's continued absence would cause an undue hardship. BHN would have preferred that Plaintiff return to his CAE job rather than BHN having to hire and train a new employee to fill Plaintiff's position, which is why BHN offered Plaintiff one month of accommodated medical leave.

In evaluating Defendant's evidence of the undue hardship caused by Plaintiff's continued absence beyond February 7, 2016, this Court is mindful of the following:

> The ADA defines "undue hardship" as "an action requiring significant difficulty or expense" when considered along with the following factors: (1) the nature and cost of the reasonable accommodation; (2) the overall financial resources and number of employees of the affected facility, and the effect that the reasonable

whether an accommodation causes a 'hardship' on the particular employer that is undue." Id. at 286 n.2 (citation omitted).

accommodation would have on the facility's expenses and resources or other impacts on the operation of such facilities; (3) the employer's overall financial resources, number and type of facilities, and number of employees; and (4) the type of operation run by the employer, "including the composition, structure, and functions of the workforce" as well as "the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question" to the employer. 42 U.S.C. § 12111(10)(A)-(B).

Davis v. Columbus Consolidated Government, 826 Fed. Appx. 890, 893 (11th Cir. 2020). Consideration of the impact of the accommodation upon BHN includes consideration of "the impact on the ability of other employees to perform their duties and the impact on [BHN's] ability to conduct business." See 29 C.F.R. § 1630.2(p)(2)(v).

The evidence before the Court shows that Plaintiff's continued absence negatively impacted the ability of his co-workers and his supervisor to do their own jobs, and it negatively impacted the CAE department's ability to hit its departmental MRR goals. When an accommodation of medical leave would result in other employees having to work longer or harder, such may show that the requested accommodation creates an undue hardship for the employer. See Davis, 826 Fed. Appx. at 893 (considering the impact of the requested accommodation of nine weeks of medical leave on the remaining bus operators that would have to cover the plaintiff's bus routes and finding that the defendant showed that the accommodation would cause an undue hardship); Winnie v. Infectious Disease

Associates, P.A., 750 Fed. Appx. 954, 958, 962 (11th Cir. 2018) (considering the impact of the requested accommodation of four months of medical leave on the remaining IV nurses that "were exhausted and overworked" because the defendant was already short-staffed and finding that the defendant showed that the accommodation would cause an undue hardship); Turco v. Hoechst Celanese Corp., 101 F.3d 1090, 1094 (5th Cir. 1996) (stating that "an accommodation that would result in other employees having to work harder or longer is not required under the ADA"); Milton v. Scrivner, Inc., 53 F.3d 1118, 1125 (10th Cir. 1995); Rehrs v. Iams Co., 486 F.3d 353, 357 (8th Cir. 2007).

Plaintiff's response to Defendant's undue hardship argument consists of two sentences in a footnote:

> Though [Defendant] asserted in its Affirmative Defenses that the accommodation requested (a few more weeks of leave) would have created an undue hardship, it has not met its burden of proving this defense. Nadler v. Harvey, No. 06-12692, 2007 U.S. App. LEXIS 20272, at *29 (11th Cir. Aug. 24, 2007). Indeed, the fact that [Plaintiff's] own position was not filled before the arbitrary February deadline imposed by BHN contradicts their [sic] contention and certainly could support a finding that no such hardship existed.

(Doc. No. 52, p. 15 n.12). Thus, Plaintiff argues that because BHN held his CAE position for him during his accommodated medical leave through February 7, 2016, such shows that BHN would not suffer undue hardship by continuing to hold

32

his position for him and accommodate him with additional medical leave thereafter for an additional month-and-a-half. The Court rejects this argument.

As previously stated, the evidence before the Court shows that BHN concluded that it could only offer an additional month of accommodated medical leave (through February 7, 2016) before Plaintiff's continued absence would cause an undue hardship. BHN would have preferred that Plaintiff return to his CAE job rather than BHN having to hire and train a new employee to fill Plaintiff's position, which is why BHN offered Plaintiff one month of accommodated medical leave and held his CAE position for him during that time. When Plaintiff did not return on February 8, 2016, BHN released his CAE position and filled it with Michael Xeroseres that same month.

Plaintiff has not pointed to any evidence to rebut Defendant's contention that providing Plaintiff with an additional month-and-a-half of accommodated medical leave after February 7, 2016 would have caused BHN undue hardship. Thus, the evidence before the Court supports Defendant's contention that Plaintiff's requested accommodation of medical leave through March 21, 2016 (and holding his CAE position for him during that time) would have caused an undue hardship, and as such, was not required. Because Defendant has met its burden of proving the affirmative defense of undue hardship, Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claim.

### D.  Retaliation

In Count III, Plaintiff contends that BHN retaliated against him for requesting accommodations and for objecting to the unlawful disability discrimination to which he was being subjected.  (Doc. No. 16, ¶ 82).  In order to succeed on his retaliation claim, Plaintiff must show: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the adverse employment action and the protected activity.  See Stewart, 117 F.3d at 1287.  If Plaintiff can establish a *prima facie* case, then the burden-shifting framework applies, and Defendant must proffer a legitimate, non-discriminatory reason for its action.  See id.  If Defendant meets its burden of production, Plaintiff must offer evidence showing that Defendant's proffered reason is pretext for retaliation.  See id.

With respect to the first element, Plaintiff contends that he engaged in protected activity when he: (1) complained to HR about Oberecker not adjusting his MRR goals to reflect the FMLA leave that he had taken, which resulted in Oberecker giving him a verbal warning in January of 2015 (which was later removed); (2) complained to HR in March and April of 2015 about being ignored by Oberecker and Linda Collins when he returned from leave; and (3) requested accommodated medical leave of two-and-a-half months on January 9, 2016.  With respect to the second element, Plaintiff contends that he suffered two adverse

employment actions: (1) BHN forced him to take medical leave after February 7, 2016; and (2) BHN terminated his employment. (Doc. No. 16, ¶ 83). Finally, given the close timing between his request for accommodated medical leave in January of 2016 and BHN's decision not to accommodate him beyond February 7, 2016 and then terminating his employment at the end of March 2016, Plaintiff contends that he has shown a causal connection.

Assuming that Plaintiff can establish a *prima facie* retaliation claim (despite the fact that Plaintiff contends that BHN retaliated against him for requesting an accommodation that BHN partially granted), Defendant has proffered legitimate, non-discriminatory reasons for its actions. Specifically, Defendant responds that accommodating Plaintiff with medical leave beyond February 7, 2016 would have caused it an undue hardship. Thereafter, Plaintiff was not the most qualified applicant for any open positions that he applied for within BHN, and Plaintiff's failure to secure another position within BHN resulted in his termination.

Plaintiff has not offered any evidence (or even sufficient argument) showing that Defendant's proffered reasons are pretextual. In response to Defendant's undue hardship explanation, Plaintiff responds: "Here, a jury could certainly find that BHN's failure to fill [Plaintiff's] CAE position until only a couple of weeks before his projected return belies its claim that it would be an undue burden for the company to keep the position open for [Plaintiff] for that length of time." (Doc.

No. 52, p. 19).  Defendant, however, has offered evidence that BHN held

Plaintiff's CAE position for him as an accommodation during his accommodated

medical leave through February 7, 2016, after which continuing to do so would

have caused an undue hardship.  BHN filled his CAE position in February of 2016,

and Plaintiff's short-term disability leave did not end until March 28, 2016.

Furthermore, Plaintiff does not respond to BHN's argument that he was not

the most qualified applicant for any open positions after his CAE position was

filled.[9]  As previously noted, Plaintiff concedes that he does not know the

qualifications of the people selected for the two positions or whether they were

more qualified than him.  (Doc. No. 48, depo. p. 263-64).

Thus, Plaintiff has not offered any evidence to rebut Defendant's legitimate,

non-discriminatory reasons for its actions.  Instead, Plaintiff argues that he can

defeat summary judgment by presenting a convincing mosaic of circumstantial

evidence that would allow a jury to infer intentional discrimination.  See Smith v.

Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)(citations omitted).

The Court, however, rejects Plaintiff's argument that the evidence, construed in the

light most favorable to him, presents a convincing mosaic of circumstantial

evidence that would allow a jury to infer intentional discrimination against Plaintiff

---

[9] The Court also notes that the decisionmakers that selected the people to fill the two open positions were not aware of Plaintiff's protected activity, and as such, they could not have been motivated to retaliate against him for protected activity of which they were unaware.

in retaliation for his complaints of disability discrimination and his request for an accommodation. Accordingly, the Court finds that Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (Doc. No. 46) is **GRANTED.** The Clerk is directed to enter judgment in favor of Defendant and to close this case.

DONE AND ORDERED at Tampa, Florida, this 21st day of June, 2021.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record